**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

MAR - 2 2016

)
TEENA DUONG,                                  )
)
        *Plaintiff,*               )
)
    v.                                      )          Civil Action No. 1:15-cv-784
)
BANK OF AMERICA, N.A.,                        )
)
        *Defendants.*              )
)

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Bank of America's Motion for

Summary Judgment. For the reasons outlined below, the Motion is GRANTED.

### I. Background

On January 23, 2012, Duong began working for the Bank of America at a branch in San

Diego, California as a small business banker ("SBB"). In San Diego, she reported to Karen

Harrison. In November of 2012, Duong applied for a small business banker position at a branch

in Annandale, Virginia. She was looking to transfer to Virginia to get married. Zachary Hauser

interviewed and hired her for the position. Duong began working in the Annandale branch on

February 2, 2013. Duong made a one year commitment to work at the Annandale office. She

worked at that branch until she was terminated on August 28, 2013.

#### A. Duong's Transfer Requests

Shortly after she transferred to Annandale, in February or March of 2013, Duong asked to

transfer to a position in Alexandria. Duong made this request because the individual holding the

Alexandria position had recently resigned and she was living in Arlington, which is closer to

Alexandria than to Annandale. She also believed that Alexandria was a more affluent

1

neighborhood. Hauser denied Duong's transfer request. Defendant asserts that before the end of 2012, Hauser, and other small business banking managers, had decided to move Armond Alford, an African-American male working at a branch in Washington, D.C., into the Alexandria position. Accordingly, the Alexandria position was never open or advertised as open. Defendant also asserts that Duong was ineligible for the Alexandria position as she had just transferred to the Annandale branch. Duong maintains that she was "racially steered" to work in the Annandale and Springfield locations. Duong alleges that Hauser told her that because she was Asian, she "would be better able to connect with the Korean community from the Annandale, Springfield locations."

In May of 2013, Duong contacted Karen Harrison in San Diego and informed her that she was not getting along with Hauser. In June of 2013, Duong contacted Keesha Alexander, a recruiter at Bank of America, to request to be transferred back to California because her father, who lived in California, had recently fallen ill. From June 27, 2013, to July 13, 2013, Duong vacationed in California and interviewed for several positions with Bank of America while she was there. Duong did not tell Hauser that she was interviewing for these positions. Duong was told by Adele Green that she could take a position in Laguna Niguel, California, if her transfer was approved by Hauser. Green then contacted Hauser, who denied the transfer request because Duong was only six months into her one year commitment to the Virginia office.

### B. Events Leading Up to Duong's Termination

On July 31, 2013, Duong told one of her co-workers, Sunny Kim, that she was traveling to California for a few days. Duong had not told Hauser about this trip and Duong asked Kim not to tell Hauser. Kim did not heed this request and told Hauser about Duong's absence. Duong traveled to California on August 1, 2013. Duong alleges that her husband, a former U.S.

2

Marine who was experiencing mental health problems, including bipolar and manic behavior, bought the tickets to California without informing her. Duong maintains that she traveled to California because she was fearful for her husband's mental and physical health. Duong also asserts that she was working remotely and in contact with her clients while she was in California.

After Hauser found out about Duong's California trip, Hauser called Duong on August 5, 2013. Duong admits that she told Hauser she was in Virginia during this call and that this was a lie. Duong says she lied because she was embarrassed about her husband's mental health problems and her failing marriage. During the call, Duong told Hauser that she was not feeling well but that she was heading to a banking center in Virginia to meet with a fellow employee. Hauser then contacted the banking centers that Duong supported. Duong had not been seen at one of the banking centers in two weeks and had not been seen at the other in four weeks. Hauser also contacted the co-worker whom Duong said she was going to meet with. The co-worker told Hauser that Duong did not meet with him and that he had not seen her in two weeks.

Following these events, Hauser spoke with a human resources advisor at Bank of America about Duong's dishonesty and discussed terminating Duong's employment. Shortly thereafter, Hauser and Sue Lonergan, the small business banking executive, decided to terminate Duong's employment, but agreed to give Duong an opportunity to explain her actions. This decision was approved by an Advisor in the Bank's Advice and Counsel office. While speaking with this Advisor, Hauser received an email from Aetna notifying him that Duong had submitted a request for leave under the Family Medical Leave Act ("FMLA") to care for her father. The Advisor told Hauser that no disciplinary action should be taken until after Duong returned from FMLA leave.

Duong was given FMLA leave from August 6, 2013, until August 21, 2013. On August 19, 2013, Duong flew with her husband from California to Florida where they remained until August 23, 2013. Again, Duong maintains that her husband suddenly and without notice bought these plane tickets. Duong further asserts that she went with her husband to Florida to protect her marriage and her husband's health. On August 20, 2013, Duong emailed Aetna to request an extension in her FMLA leave until August 27, 2013. Duong did not inform either Aetna or Bank of America that she was no longer with her father but simply requested more time to care for her family. Duong returned to northern Virginia on August 23, 2013. Duong did not return to work until August 28, 2013. Duong asserts that during this time she was taking care of her husband who was experiencing violent mood swings and threatening to injure himself and others.

Hauser met with Duong on the morning of August 28, 2013. During this meeting, Duong failed to provide a reasonable explanation for why she did not tell him about her trip to California on August 1, 2013. After conferring again with the Advice and Counsel Advisor, Hauser terminated Duong. Hauser maintains that he terminated Duong for her dishonesty.

### C. Procedural Posture

On October 21, 2013, Duong filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging race, sex, national origin, and religious discrimination and retaliation. A copy was also filed with the Fairfax County Human Rights Commission. Duong filed the Complaint in this case on June 19, 2015. Duong brings six causes of action: (1) race discrimination in violation of § 1981; (II) race, sex, and national origin discrimination under Title VII; (III) interference under the FMLA; (IV) retaliation under the FMLA; (V) violation of the Fair Labor Standards Act; and (VI) breach of contract. A final pretrial conference was held

4

on January 21, 2016, and this case was set for trial on April 4, 2016. On February 5, 2016, Defendant filed the current Motion for Summary Judgment.

## II. Summary Judgment Legal Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). As the Supreme Court has explained, "this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A dispute over an issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Finally, in making a summary judgment determination, the Court must bear in mind that "[a] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## III. Discussion

Defendant seeks summary judgment on all six claims asserted in the Complaint. Plaintiff, in its briefs, abandoned Counts V and VI. The Court will DISMISS these claims without further discussion. The Court will address the remaining Counts in turn.

### A. Counts I and II: Discrimination Under § 1981 and Title VII

Counts I and II both claim employment discrimination based on race.[1] There are two ways that an employment discrimination plaintiff may defeat a motion for summary judgment and establish a claim for race discrimination. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007). First, a plaintiff may demonstrate, through direct or circumstantial evidence, that her race was a motivating factor in the employer's adverse employment action. *Id.* (citations omitted). Second, a plaintiff may proceed under the "pretext" framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.*

Plaintiff asserts that the first method, also known as a "mixed-motive" analysis, is appropriate because she has direct evidence of discrimination. To establish employment discrimination under a mixed-motive analysis, the plaintiff must demonstrate, through direct or circumstantial evidence, that "race . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 317 (4th Cir. 2005) (quoting 42 U.S.C.A. § 2000e–2(m)). Under this analysis, a plaintiff must provide "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Penn v. Aerospace Corp.*, 2009 WL 585839, at *3 (E.D. Va. Mar. 6, 2009) (quoting *Rhodes v. F.D.I.C.*, 257 F.3d 373, 391–92 (4th Cir. 2001).

Imperative to Plaintiff's claim is the identification of an adverse employment action. *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1254 (4th Cir. 1985) ("The law affords no protection from discrimination unless there has been some adverse employment action by the employer."); *see also Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999). An adverse employment action can

---

[1] Count II actually claims race, sex, and national origin discrimination under Title VII. However, Plaintiff never presents any evidence of sex discrimination and does not mention national origin discrimination in her opposition brief. Thus, the Court will only focus on the race discrimination claim.

be a discharge, demotion, failure to promote, or any other action that includes a significant

change in benefits or reassignment with significantly different responsibilities. *See Boone*, 178

F.3d at 256–57.

It was clarified at oral argument that Plaintiff is challenging Hauser's declination of her

request to transfer to the Alexandria office. Plaintiff asserts that Hauser denied her transfer

request because of her ethnicity. She alleges that Hauser told her that she would connect better

with the Korean community in Annandale.

An employer's "mere refusal to grant a transfer that an employee desires does not qualify

as an adverse employment action unless the decision 'had some significant detrimental effect' on

the employee." *Wagstaff v. City of Durham*, 233 F. Supp. 2d 739, 744 (M.D.N.C. 2002) *aff'd*, 70

F. App'x 725 (4th Cir. 2003) (quoting *Boone*, 178 F.3d at 256). Detrimental effects include

reduced pay, a diminished opportunity for promotion, less responsibility, or a lower rank. *Id.*;

*Boone*, 178 F.3d at 256; *see also Stewart v. Ashcroft*, 211 F.Supp.2d 166, 174–75 (D.D.C. 2002)

(holding that a refusal to transfer is not an adverse employment action when wages, promotional

opportunity, and job responsibilities remain unaffected); *LePique v. Hove*, 217 F.3d 1012, 1014

(8th Cir. 2000) (finding "no reason to suppose" that a failure to transfer should be "treated any

differently" than an actual transfer). The Annandale and Alexandria positions had the same

titles, levels of responsibility, job duties, and opportunities for promotion. Duong's salary, goals,

and opportunities to earn incentives would not have changed if she transferred to Alexandria.

Plaintiff does not contest these facts. Plaintiff does argue that she believed Alexandria was a

more affluent neighborhood and that she would be able to earn higher commissions if she

worked there. However, Plaintiff's argument is pure conjecture; she presents no evidence to

support this allegation. Considering the facts on the record, the Court must conclude that the

refusal to transfer Duong to the Alexandria position was not an adverse employment action because there was no significant detrimental effect on her.

Because an adverse employment action is a necessary requirement of a Title VII or a § 1981 claim, and Plaintiff has failed to prove she suffered an adverse employment action, the Court will grant the Motion for Summary Judgment as to Claims I and II.

### B. Counts III Interference With the FMLA

Employees covered by the FMLA are "entitled to a total of 12 workweeks of leave during any 12–month period" for family- and health-related matters," 29 U.S.C. § 2612(a)(1), and have a right "to be restored by the employer to the position of employment held by the employee when the leave commenced" or to "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." *Id.* § 2614(a)(1)(A)-(B). An employee who is denied these entitlements can bring an "interference" claim. *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 546 (4th Cir. 2006); 29 U.S.C.A. § 2615(a)(1) ("It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."). However, the statute also dictates that an employee is not entitled "to any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2612(a)(3)(B).

A plaintiff bringing an interference claim must establish that "(1) she was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled." *Bullock v. Kraft Foods, Inc.*, 2011 WL 5872898, at *4 (E.D. Va. Nov. 22, 2011) *aff'd*, 501 F. App'x 299 (4th Cir.

8

2012) (citing *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006). Plaintiff must also establish that the violation prejudiced her in some way. *Anderson v. Discovery Commc'ns, LLC*, 517 F. App'x 190, 197 (4th Cir. 2013) (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)).

Plaintiff asserts that Defendant has interfered with her FMLA rights in two ways. First, Plaintiff bases her interference claim on Hauser's refusal to authorize Duong's request to transfer to Bank of America's Liguna Niguel, California, office in the summer of 2013. Plaintiff has not identified any statute or case law to support her claim that she was entitled, under the FMLA, to transfer to the Liguna Niguel office. The Court concludes that this is not a benefit to which Plaintiff was entitled to under the FMLA and, thus, it cannot form the basis of Plaintiff's interference claim.

Second, Plaintiff bases her interference claim on Hauser's termination of Duong's employment in August of 2013. Defendant contests whether the fifth element of Plaintiff's interference claim has been satisfied. Duong was not restored to her position when she returned to work on August 28, 2013, after she had taken FMLA leave. This appears to be a denial of FMLA benefits. However, the Fourth Circuit has adopted the position that "the FMLA does not require an employee to be restored to his prior job after FMLA leave if he would have been discharged had he not taken leave." *Yashenko*, 446 F.3d at 547. The Secretary of Labor has also promulgated a regulation taking this position. *See* 29 C.F.R. § 825.216.

Defendant has presented evidence that Duong would have been discharged had she not taken FMLA leave. Specifically, Hauser and his boss, Susan Lonergan, met in early August and agreed to terminate Duong's employment subject to providing her an opportunity to explain her actions. Hauser also met with an Advisor in Advice and Counsel in early August and they

agreed that terminating Duong was the proper course of action. This decision was reached after Hauser learned that Duong had lied about traveling to California but before she requested FMLA leave.

Plaintiff asserts that her un-reported trip to California and her dishonesty were not sufficient grounds to terminate her. Plaintiff throws a handful of arguments out in support of this position, none of which are viable. First, Plaintiff claims that her trip to California was permissible because she was allowed to work remotely. However, as Plaintiff states in her opposition brief, SBBs were allowed to work remotely "from their house, their car, the center, [and] the client's office." Pl. Opp. Brief, at 5. Traveling out of state does not fall under any of these categories or justify Duong's dishonesty about her whereabouts.

Second, Plaintiff claims that Hauser was monitoring her work habits too closely in the hopes that he would find grounds to fire her. This argument is inapposite. An employer is allowed to monitor employee work habits and check up on employees to make sure they are doing their job. Hauser's call to Duong was particularly justified in this situation as Hauser was tipped off by Kim that Duong was out of state. Further, Duong's argument that Hauser's close monitoring was motivated by FMLA-animus is misplaced because Hauser checked up on Duong before she requested FMLA leave.

Third, Plaintiff asserts that her trip to California was permissible because she had to take care of her manic-depressive husband. However, as Plaintiff admits, this reason for the California trip was never communicated to Bank of America and Plaintiff never requested FMLA leave to take care of her husband during this time. Thus, Hauser only knew that Duong took a trip without informing him and lied about where she was during work hours. This is a legitimate reason for terminating Duong, no matter the underlying reason for the trip.

Finally, Plaintiff alleges that the Bank's human resources department never told Hauser to terminate Duong. In support of this argument they site some language that appears in an email that is contained within an "inquire notes report" generated by the Defendant. The quote explains:

> The employee has been advised that he/she is responsible for reporting all absences, changes and extensions to you and Aetna throughout any absence period.
>
> What Happens Next:
> 1. Your employee is expected to return to work on [August 28, 2013].

Pl. Ex. G. First, this email is from Aetna—not the Bank's human resources department—to Hauser. Further, the email appears to contain standard language used in emails sent to managers to explain how FMLA leave works. This evidence in no way demonstrates that the Bank did not want Hauser to terminate Duong's employment. Further, it does not contradict Defendant's evidence that Hauser had met with Lonergan and Advice and Counsel and that these individuals had agreed to terminate Duong's employment before she requested FMLA leave.

There is no dispute over any material fact here. Defendant has presented clear evidence that it intended to terminate Duong before she requested FMLA leave. Plaintiff's attempts to discredit Defendant's decision to terminate her do not succeed. Because Duong would have been terminated even if she had not taken FMLA leave, the Court finds good cause to grant the Motion for Summary Judgment in Defendant's favor on Count III.

Defendant makes one additional argument that is worth noting. Defendant argues that Duong's interference claim fails because Duong did not use the FMLA leave for its intended purpose. While the Fourth Circuit has not address this issue, other Circuit Court have held that "[a]n employee who takes leave under the FMLA is only entitled to reinstatement if he 'takes leave under [the FMLA] for the intended purpose of the leave.'" *Scruggs v. Carrier Corp.*, 688

F.3d 821, 825 (7th Cir. 2012) (quoting 29 U.S.C. § 2614(a)(1)). Accordingly, "an employer can defeat an interference claim by showing, among other things, that the employee did not take leave 'for the intended purpose." *Vail v. Raybestos Prods. Co.*, 533 F.3d 904, 909 (7th Cir. 2008). In the Seventh Circuit, "an employer need only show that it refused to reinstate the employee based on an 'honest suspicion' that she was abusing her leave." *Scruggs*, 688 F.3d at 825. This Court need not go this far. Duong has admitted that did not use her FMLA leave for its intended purpose. Duong requested FMLA leave to take care of her father. On her paperwork she stated that she would be transporting him, and providing "basic medical, nutritional and safety" care. Duong's father was living in California at this time. On August 19, 2013, Duong left California to travel with her husband to Florida. The two stayed there for several days before returning to northern Virginia. From August 19, 2013, until August 27, 2013, Duong was not taking care of her father. This was a misuse of her leave and is enough to defeat the interference claim.

Plaintiff attempts to argue that she was taking care of her husband, rather than her father, from August 19, 2013, until August 27, 2013. Plaintiff points to the fact that when she requested an extension in her FMLA leave she indicated that she needed more time to take care of her family, not just her father.

Even if Plaintiff was taking care of her husband, that was not the "intended purpose" of the approved leave. When requesting leave, an employer must list the family member that needs care, the type of care that the employee will provide, the probable duration of the condition, and other relevant information. In addition, an employer may require an employee to submit a timely, complete, and sufficient medical certification to support a request for FMLA leave. All of this indicates that FMLA leave must be taken for the specific reasons given on a request form,

not for any other reason, even if that reason falls under the general purpose of the FMLA. Here, Plaintiff did not use her FMLA leave to take care of her father, as she had requested. She thus did not use her leave for its intended purpose. The fact that Doung did not use her leave for the intend purpose provides additional grounds for the Motion for Summary Judgment as to Count III.

### C. Count IV: FMLA Retaliation

In Count IV Duong argues that Defendant retaliated against her for filing a FMLA claim. "FMLA claims arising under the retaliation theory are analogous to those derived under Title VII and so are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–06 (1973)." *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 550-51 (4th Cir. 2006). Thus, Duong must show that "[1] [s]he engaged in protected activity, [2] that the employer took adverse action against h[er], and [3] that the adverse action was causally connected to the plaintiff's protected activity." *Id.* (quoting *Cline v. Wal–Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998)). If Duong makes this showing, the burden shifts to Bank of American to show that it has a non-discriminatory reason for the termination. *Id.* Finally, Duong has the opportunity to show that Bank of America's given reason is pretext for retaliation. *Id.*

Plaintiff again gives two bases for her retaliation claim. First, Plaintiff claims that she was retaliated against after she requested to be transferred back to California. This request is not the type of "protected activity" covered by the FMLA. The FMLA protects employees who request FMLA benefits like leave to care for a family member. Plaintiff does not cite any part of the FMLA that protects an employee's request to transfer to another office. Accordingly, this cannot form the basis of Plaintiff's FMLA retaliation claim.

13

Second, Plaintiff says that she was retaliated against in July and August of 2013. Plaintiff says Defendant took adverse action against her by closely monitoring her work habits, calling her unexpectedly when she was allowed to work remotely and without supervision, and terminating her on August 28, 2013. Only the third of these actions, Plaintiff's termination, occurred after Plaintiff requested FMLA leave. Thus, Plaintiff's termination is the only relevant adverse employment action here.

Defendant asserts that the third element of Duong's prima facie case, that the adverse action was causally connected to the plaintiff's protected activity, has not been satisfied. Defendant asserts that because the decision to terminate Duong was made before Defendant was put on notice that Duong was taking FMLA leave, there is no causal connection between the two. Plaintiff tries to discredit Defendant's explanation of her termination for the same reasons given in the previous section. As explained above, all of those arguments were unavailing. Defendant had a legitimate reason for terminating Duong. The evidence shows Duong lied to Hauser and that the decision to terminate her because she lied was made before she requested FMLA leave.

Even if we assume that the temporal proximity between the FMLA leave and Plaintiff's termination is enough to establish a prima facie case of discrimination, Plaintiff's claim still should not survive summary judgment. Defendant has articulated a legitimate, non-retaliatory reason for terminating Plaintiff: her dishonesty about her trip to California. Plaintiff, in turn, has made no effort to present any evidence that Plaintiff's reasoning was pretext for retaliation. Accordingly, the Court finds good cause to grant Summary Judgment in favor of the Defendant on Count IV.

## IV. Conclusion

For the reasons outlined above, the Court ORDERS that Defendant's Motion for

Summary Judgment is GRANTED.  The Court further ORDERS that the Complaint is

DISMISSED WITH PREJUDICE.  An appropriate Order will issue.

March 2, 2016
Alexandria, VA

/s/

Liam O'Grady
United States District Judge

15